[No. B058211. Second Dist., Div. Three. June 23, 1992.]

UNITED TRANSPORTATION UNION, AFL/CIO, Plaintiff and Appellant,
v.
SOUTHERN CALIFORNIA RAPID TRANSIT DISTRICT, Defendant and
Respondent.

**COUNSEL**

Lawrence Drasin for Plaintiff and Appellant.

Suzanne B. Gifford, Jeffrey J. Lyon, Richard A. Katzman and Sharon G. Sanders for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—In this appeal we are asked to determine whether a controversy which arose between a labor organization and an employer concerning one of its employees is subject to arbitration pursuant to the collective bargaining agreement between the parties. The controversy centers around the rights of a part-time employee who took a pregnancy leave of absence. The specific provisions in the parties' collective bargaining agreement regarding leaves of absence apply only to full-time employees and the question presented here is whether certain other language in the agreement, more general in nature, can be construed to give leave of absence protection to the employee. The employer refused to send the issue to arbitration, contending the arbitration clause in the agreement does not cover it. The trial court agreed. However, we conclude that the dispute between the parties is indeed subject to arbitration and we reverse the order of the trial court which denied the labor organization's petition to compel arbitration.

### FACTUAL BACKGROUND

Cyndi Ortega (Ortega) was employed by the Southern California Rapid Transit District (the District) as a part-time bus operator and was represented by the United Transportation Union, AFL/CIO (the Union). On June 10, 1989, Ortega took a pregnancy leave of absence. The District states that Ortega was given a four-month leave of absence pursuant to Government Code section 12940 et seq.

Ortega's pregnancy necessitated a birth by cesarean section and her doctor did not release her to return to work until November 20, 1989, a little over five months after she temporarily stopped working. In the meantime, the District had taken action regarding her extended absence. On October 13, 1989, it wrote a letter to her which states that (1) the District had requested (by an earlier letter, mailed on Sept. 5, 1989) that Ortega return to work and she had not done so; (2) Ortega, as a part-time employee, is not covered under article 31, section 1[1] of the collective bargaining agreement between the Union and the District; and (3) because Ortega had not yet returned to

---

[1] Article 31 of the collective bargaining agreement covers employee leaves of absence. Subdivision (b) of section 1 of article 31 states that no employee will lose his or her seniority due to a leave of absence taken because of illness or injury unless said leave is in excess of one year; and subdivision (d) of section 1 of article 31 provides that pregnant employees can receive leaves of absence of up to one year.

Article 50 of the collective bargaining agreement specifies the articles of the agreement which apply to part-time employees. Article 31 is not among them. Nor is article 47, which deals with sick leave.

work, the District would consider her to have resigned from her job as of October 10, 1989.

The Union appealed the District's decision through various administrative appeal (grievance) processes set out in the collective bargaining agreement but its efforts on behalf of Ortega were to no avail. The Union demanded arbitration of the dispute but the District refused to arbitrate. Thereafter, the Union filed a petition to compel arbitration, and the District filed an answer to the petition in which it denied there was an arbitrable dispute. Each side filed points and authorities. On March 29, 1991, the trial court denied the petition to compel arbitration and the Union filed its appeal from that order, as permitted under Code of Civil Procedure section 1294.

## DISCUSSION

### 1. *The Governing Law*

Section 1281.2 of the Code of Civil Procedure states that, except in situations not relevant here, "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." ■ Thus, under section 1281.2, it is the trial court that determines if there is a duty to arbitrate the particular controversy which has arisen between the parties. (*Freeman* v. *State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 480 [121 Cal.Rptr. 477, 535 P.2d 341].) In performing its duty to determine if the parties have agreed to arbitrate that type of controversy, the court is necessarily required "to examine and, to a limited extent, construe the underlying agreement." (*Ibid.*)

Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear that the arbitration clause cannot be interpreted to cover the dispute. (*O'Malley* v. *Wilshire Oil Co.* (1963) 59 Cal.2d 482, 491 [30 Cal.Rptr. 452, 381 P.2d 188].) Additionally, "If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit." (Code Civ. Proc., § 1281.2; *O'Malley* v. *Wilshire Oil Co., supra,* 59 Cal.2d at pp. 486-487; *Amalgamated Transit Union* v. *San Diego Transit Corp.* (1979) 98 Cal.App.3d 874, 879 [159 Cal.Rptr. 775].) ■ Thus, we see that if there is a rule of thumb regarding contractual arbitration, it is that such arbitration

is a highly favored means of dispute resolution. This includes labor disputes involving collective bargaining agreements. (*Griggs* v. *Transocean Air Lines* (1960) 176 Cal.App.2d 843, 847 [1 Cal.Rptr. 803], disapproved on another point in *Posner* v. *Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 183 [14 Cal.Rptr. 297, 363 P.2d 313].)

Our Supreme Court has stated that broad contractual provisions for arbitration are to be liberally construed. ■ In *Posner* v. *Grunwald-Marx, Inc.*, *supra*, 56 Cal.2d 169, 175, the court said: "[W]here the collective bargaining agreement provides for arbitration of all disputes pertaining to the meaning, interpretation and application of the collective bargaining agreement and its provisions, any dispute as to the meaning, interpretation and application of any specific matter covered by the collective bargaining agreement is a matter for arbitration. Doubts as to whether the arbitration clause applies are to be resolved in favor of coverage. The parties have contracted for an arbitrator's decision and not for that of the courts." Then, quoting from a United States Supreme Court case, the *Posner* court stated: "The high court declared that 'The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.' (*Steelworkers* v. *American Mfg. Co.* [1960] 363 U.S. 564, 567-568 [4 L.Ed.2d 1403, 1406-1407, 80 S.Ct. 1343].)" (*Ibid.*)

Additionally, our high court, in *O'Malley* v. *Wilshire Oil Co.*, *supra*, 59 Cal.2d, at page 488, while discussing the United States Supreme Court decision in the *Steelworkers* v. *American Mfg. Co.* case, stated: "The [Supreme Court] concluded: 'The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware.' (363 U.S. at pp. 567-568 . . . .)"

2. *The Breadth of the Arbitration Clauses at Issue in the Instant Case*

■ Looking at the collective bargaining agreement at issue in this case, we find that article 50 of the agreement makes articles 26 and 27 applicable

to part-time employees like Ortega. Both articles 26 and 27 contain broad contractual provisions for arbitration, similar to the kind addressed in the *Posner, O'Malley* and *Steelworkers* decisions.

### a. *Article 26*

Article 26 is entitled *"Filing of Claims—Procedure—Limitations."* Section 1 of article 26 shows that the "claims" referred to in the title of article 26 have to do with "Claims or disputes with respect to *the interpretation or application of the terms of this Contract.*" (Italics added.) Section 11 of article 26 further defines "claims" by stating: "The term 'Claim' as used herein means any time claim, or other claim other than discipline which may arise under *the application or interpretation of this Contract.*" (Italics added.) Section 7 of article 26 states, in part, that "If the claim is not satisfactorily settled and the Union desires, the claim may be submitted to arbitration upon the Union's written request."

### b. *Article 27*

Specific provisions regarding article 27 actually begin in section 15 of article 26. Section 15 of article 26 states: "It is understood and agreed that the provisions of this Article and Article 27 shall be the sole and exclusive means of settling any dispute or controversy *arising out of the application or interpretation of this Contract.*" (Italics added.) Article 27 is entitled *"Discipline Rule."* Section 2 of article 27 is entitled "Types of Discipline" and it sets out the two main classes of improper behavior for which discipline will be imposed—"major infractions of the District's rules" and "other infractions of District rules." Among the infractions included as "major infractions" are excessive absenteeism and being absent without permission. Section 2 states that the major infractions "will subject the employee to suspension or discharge." Section 13 of article 27 states: "If a grievance or dispute is not satisfactorily adjusted between the General Manager or his/her representative and the United Transportation Union, a request for Arbitration may be submitted . . . ."[2]

### 3. *The Positions of the Union and the District*

The District's position is that the parties, in their collective bargaining agreement, expressly agreed to exclude sick leaves and other leaves of

---

[2]Additionally, we note that one of the stated purposes of entering into the collective bargaining agreement is to "Provide for the amicable adjudgment of disputes which may arise out of the application or interpretation of [the agreement]."

absence from the contractual rights afforded part-time workers (*ante*, fn. 1) and there is nothing in the agreement which overrides the specific intent of that exclusion.

The Union acknowledges that articles 31 and 47 of the collective bargaining agreement do not apply to part-time employees. However, it argues that just because the agreement has no *specific* leave of absence provisions for such employees, that does not mean the agreement contains *no* constraints on the District which prevent the District from terminating a part-time employee whose pregnancy necessitates that she stay away from work for longer than the statutory four months which the District "gives" her.[3]

The Union contends that even though Ortega is not entitled to the specific leaves of absence afforded full-time workers under the agreement, nevertheless the agreement does contain restraints which prevent a loss of job such as Ortega experienced. The portions of the agreement on which the Union relies are characterized by the District as being only "general purpose language of the contract."[4]

Specifically, the Union points to a provision which prevents employee discrimination based on sex and a provision which states that both the Union and the District recognize that a spirit of cooperation between the two is necessary if they are to provide good service to the customers of the District and in that spirit, they are desirous of entering into a collective bargaining agreement which will, among other things, "Provide for the fair treatment of [the] employees [of the District]."

Additionally, the Union cites a section of the agreement entitled "Union— District Responsibility." Said section provides, among other things, that (1) "All matters pertaining to the management of operations, including . . . the maintenance of *discipline and efficiency*, the hire, promotion and transfer of employees, and their *discharge or discipline for proper cause*, are the prerogatives of the District" and (2) "The District's exercise of any prerogatives of management . . . that is violative of any provisions of [the collective bargaining agreement] may be made the subject of a grievance or dispute."

---

[3]The District asserts that this case concerns Ortega's "constructive resignation." The Union challenges the District's characterization of how Ortega came to be without a job with the District and argues that she did not resign but rather was terminated by the District because of her absence from work. This is an issue to be addressed by the arbitrator.

[4]Whether those provisions, or any other provisions in the collective bargaining agreement, provide security and protection for employees in situations similar to Ortega's (as the Union contends they do), or whether the Union is simply trying to override article 50, as it pertains to articles 31 and 47 (as the Districts contends the Union is trying to do), are issues to be resolved by the arbitrator.

(Italics added.) Further, the introduction to article 27, (the "discipline" article of the collective bargaining agreement), provides that the agreement "is based upon a spirit of cooperation between the employees and the District to provide a fair and equitable basis for the parties to handle discipline matters which may be brought before them."

According to the Union, the thrust of the totality of these separate provisions is that under the collective bargaining agreement, employees are to be treated in a fair manner, without discrimination on the basis of sex, and discipline is to be handled in a fair and equitable manner, including discharge and discipline only for a *proper cause*. According to the Union, such provisions provide the restraint which should have prevented the District from terminating Ortega simply because her pregnancy necessitated her staying away from work for a few more weeks than the District provided for the pregnancy.

As noted above, provisions in articles 26 and 27 contain broad contractual provisions for arbitration of claims, disputes or controversies arising out of the application or interpretation of the terms of the collective bargaining agreement. The issue of whether the collective bargaining agreement contains restraints on the District's ability to discharge persons in Ortega's position is a claim, dispute or controversy that arises out of the application and interpretation of the terms of the agreement. Thus, the Union's petition to compel arbitration should have been granted.

### 4. *The "Public Agency" Factor*

#### a. *Background*

Citing *Service Employees International Union* v. *County of Napa* (1979) 99 Cal.App.3d 946 [160 Cal.Rptr. 810], the District argues that "The public policy that favors arbitration of all disputes in the private sector, does not apply to public sector disputes such as those involving the District." In *Service Employees*, the court affirmed the trial court's refusal to order to arbitration a dispute between the parties in that case. To support its decision, the *Service Employees* court cited a federal circuit court case which refused to apply arbitration to a contract between a union and the United States government because the definition of "employer" in the federal Labor-Management Relations Act specifically excludes the United States. The *Service Employees* court noted that the same definition excludes not only the United States but also " 'any State or political subdivision thereof' (29 U.S.C. § 152) such as the County." (*Id.* at pp. 953-954.)

To support its decision, the *Service Employees* court also relied on a New York case (involving a collective bargaining agreement entered into by a

school district) which held that in the field of public employment, arbitration does not carry the same historical or general acceptance, or efficiency, as it does in the private sector. The *Service Employees* opinion quoted the following from that case: " 'Accordingly, it cannot be inferred as a practical matter that the parties to collective bargaining agreements in the public sector always intend to adopt the broadest permissible arbitration clauses. Indeed, inasmuch as the responsibilities of the elected representatives of the taxpaying public are overarching and fundamentally nondelegable, it must be taken, in the absence of clear, unequivocal agreement to the contrary, that the board of education did not intend to refer differences which might arise to the arbitration forum. Such reference is not to be based on implication.' " (*Service Employees International Union* v. *County of Napa, supra,* 99 Cal.App.3d at p. 954, italics deleted.)

As additional reasons for its refusal to order the dispute to arbitration, the *Service Employees* court referred to our state's constitutional directives that (1) power in the state is vested in the people and their *chosen* representatives; (2) the *governing body* of each county is to provide for the compensation of its employees; and (3) the Legislature cannot delegate to a private person power to control or to interfere with county or municipal matters or perform municipal functions. (*Service Employees International Union* v. *County of Napa, supra,* 99 Cal.App.3d at pp. 954-955.) Lastly, the court said: "Furthermore, constitutional, statutory, and decisional law aside, we are of the opinion that no sound public policy would be served by judicial or legislative imposition upon an *unwilling* local public entity of an arbitrator whose discretion is beyond judicial or any review." (*Id.* at p. 956.)

### b. *Rejection of the Service Employees Case*

■ We reject the whole of the analysis in *Service Employees* and we do so on several grounds. To begin with, California cases decided before *Service Employees* show a preference for arbitration of disputes involving local public agencies. *Taylor* v. *Crane* (1979) 24 Cal.3d 442 [155 Cal.Rptr. 695, 595 P.2d 129], was a case involving a public entity. It involved a labor dispute between a discharged police officer and the Berkeley City Manager who discharged him because he had violated a city police regulation. In its opinion, the *Taylor* court described arbitration as a "favored means of resolving labor disputes in this state [because it] eases the burdens on courts while resolving disputes quickly and inexpensively. [Citations.]" (*Id.* at p. 452.)

Likewise, in *East San Bernardino County Water Dist.* v. *City of San Bernardino* (1973) 33 Cal.App.3d 942 [109 Cal.Rptr. 510], the court stated:

"California has declared its preference for the arbitrational rule established in the series of labor cases commonly referred to as the 'arbitration trilogy'—*Steelworkers* v. *American Mfg. Co.*, 363 U.S. 564 . . . ; *Steelworkers* v. *Warrior & Gulf Co.*, 363 U.S. 574 . . . ; and *Steelworkers* v. *Enterprise Corp.*, 363 U.S. 593 . . . ." (*Id.* at p. 952.) The arbitration provision at issue in *East San Bernardino County* was broad, stating in part: " 'All controversies arising out of the interpretation or application of this agreement or the refusal of either public agency to perform the whole or any part thereof shall be settled by arbitration . . . .' " (*Id.* at p. 945.) When a question arose as to whether the rate which the City was charging the District for water was proper, the court stated: "The parties here entered into a broad agreement to arbitrate. They could have excluded from the arbitration process the specific area relating to the charges to be made for the services provided by the City. The only exclusionary clause in the arbitration provisions of the [agreement] is the sentence: 'The arbitration board shall have no power to add to or subtract from this agreement.' This general statement does not exclude the particular issue of charges from arbitration. We are of the opinion, in the absence of an express provision removing a particular issue from arbitration, that only a clear-cut expression to exclude a claim from arbitration can prevail, particularly where, as here, the exclusion is general and the arbitration provisions of the [agreement] are broad. [Citation.]" (*Id.* at p. 953.)

■ As for the other theories advanced by the *Service Employees* court for its position on public sector arbitration, we hold that we are not bound by the definition of "employer" in the Labor-Management Relations Act when we determine whether the dispute between the Union and the District should be arbitrated. California's clear preference for arbitration in both the private and public sectors is our guidance. Likewise, while arbitration in New York may not carry the same historical or general acceptance or efficiency in the public sector as it does in the private sector, the appellate decisions of the courts of this state do not show a like experience. Further, in his dissent in *Service Employees*, Justice Grodin noted that "The applicability of [*Steelworkers*] trilogy principles to the public sector has been recognized by nearly all state courts which have considered the question." (*Service Employees International Union* v. *County of Napa*, *supra*, 99 Cal.App.3d at p. 963, fn. omitted.)

Additionally, we do not perceive arbitration as being an *imposition* on "unwilling" public entities. ■ "Grievance arbitration does not involve the making of general public policy. Instead, the arbitrator's role is confined to interpreting and applying terms which the employer itself has created or agreed to and which it is capable of making more or less precise. [Citation.]"

(*Taylor* v. *Crane, supra*, 24 Cal.3d at p. 453.) Were we to adopt the District's philosophy of provisions for arbitration in collective bargaining agreements entered into by a public agency, we would have to require that such agreements specifically spell out each and every thing which the parties intend to go to arbitration; it would no longer be sufficient to include in the collective bargaining agreement broad provisions for arbitration of controversies arising out of the application or interpretation of the terms of the agreement. We do not believe that local public entities and their contracting partners envisioned such a requirement when they entered into collective bargaining agreements with such broad provisions for arbitration.

### 5.  *The Issue of Waiver*

The Union contends that by allowing the dispute over Ortega to go through the "pre-arbitration" levels of administrative appeal set out in articles 26 and 27 of the collective bargaining agreement, the District has effectively waived its right to object to arbitration of Ortega's grievance. The Union asks: "Why would the District even go through the first, second or third level of the grievance procedure if the matter was not arbitrable?" The Union contends that if the District really believes the dispute is not arbitrable, it should have refused to consider the dispute at all.

We do not perceive this as an estoppel or waiver situation. To begin with, the Union has not stated how it has been harmed by the District's proceeding through the administrative appeal process. Rather than being harmed, it would seem that the Union and Ortega were benefited because they had three chances to present their position to the District in the hope of changing the District's position before the matter had to go to arbitration or to court. Further, they had three opportunities to refine their position before having to present it to a court or arbitrator. Additionally, had the District refused to consider Ortega's grievance at the administrative levels, the Union would still have wound up in court in an attempt to enforce *that* portion of the collective bargaining agreement. However, in any event, the Union has achieved what it wants from this court and there is no need to declare a waiver or estoppel.

### DISPOSITION

The order denying the petition to compel arbitration is reversed, and the cause is remanded to the trial court with directions to enter a new and

different order which is consistent with the views expressed herein. Costs on appeal to plaintiff.

Klein, P. J., and Hinz, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 17, 1992. Panelli, J., Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.