Filed 4/22/15  Lawrence v. Lawrence CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SUSAN L. LAWRENCE, | |
| Plaintiff and Appellant, | G049531 |
| v. | (Super. Ct. No. 30-2012-00590309) |
| ZAHIDE A. LAWRENCE, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed.

Thomas J. O'Keefe; and Everett L. Skillman for Plaintiff and Appellant.

Hart | King, William R. Hart, Andrew C. Kienle, and Rhonda H. Mehlman for Defendant and Respondent.

\*          \*          \*

This is a trust dispute. The appellant is Susan Lawrence (Susan). Her mother, Maxine Lawrence (Maxine) died in 1993 and disposed of certain property through a will; other property through a trust. By the terms of the trust, at Maxine's death the trust was subdivided into "Trust A," "Trust B," and "Trust C." Susan's father, Harry Lawrence (Harry), was entitled to the income of Trusts B and C for life, and Susan was the remainder beneficiary of Trusts B and C. Susan's parents owned significant art holdings. Susan contends these holdings should have been in Trusts B and C, and Harry, as trustee, misappropriated them. Respondent Zahide Lawrence (Zahide) married Harry after Susan's mother died. Harry died in 2012 and Zahide is the executor of Harry's estate. Zahide is also the successor trustee of Trust A. Zahide contends the art was never trust property because it passed directly to Harry by Maxine's will. The trial court entered judgment in favor of Zahide.

We affirm. The issue with respect to the art holdings is whether the art was encompassed by the phrase "tangible property of a personal nature," as used in Maxine's will. We conclude this phrase simply means tangible personal property, which includes the art. The result is that it passed directly to Harry, without passing into the Trust as part of the residue of Maxine's estate, and thus Susan has no claim to it.

Susan also contends Harry violated his fiduciary duties in taking out a loan on real property in Trust C and investing the proceeds in a bond fund and in purchasing a home in Dana Point. We deem these claims waived because Susan has not cited evidence in the record to support these claims and, to the contrary, ignored adverse facts in the record. Moreover, a settlement agreement Susan previously signed specifically authorized some of the uses of the funds Susan complains of, and thus, even if her claims had not been waived, there was no breach of duty.

Finally, Susan claims the court abused its discretion in denying her last-minute motion to amend her pleadings to add a cause of action for an accounting. We disagree and affirm.

2

FACTS

The Lawrence Family Trust dated January 28, 1976, as amended and restated in its entirety on January 8, 1993 (the trust) was established by Susan's parents, Maxine and Harry. Maxine died on May 17, 1993. Following Maxine's death, Harry, as the sole surviving trustee, subdivided the assets of the trust into Trust A, Trust B, and Trust C. Trust A was a revocable "survivor's trust." Trust B became an "irrevocable unified credit 'bypass trust.'" And Trust C became an irrevocable "QTIP marital trust."[1] Harry was the sole trustee of all three subtrusts. He was entitled to the entire net income from all three subtrusts for life. Susan was the remainder beneficiary of Trusts B and C and had been the remainder beneficiary of Trust A until Harry amended and restated Trust A to make his new wife, Zahide, the remainder beneficiary of Trust A.

Maxine also created a will on January 8, 1993. In it, she left all of her clothing and jewelry to Susan. To Harry she left "household furniture, and furnishings, personal automobiles, and other tangible articles of a personal nature, . . . not otherwise specifically disposed of by this will or in any other manner . . . ." Harry and Maxine had a valuable collection of oriental art. Some of the art was owned by Harry and Maxine personally, and the remainder was owned by their business, Warren Imports, which specialized in selling oriental art. The will did not specifically bequeath the art. The will contained a pour-over provision granting the residue of Maxine's estate to the trust.

In 2004, Susan sued Harry, alleging he was threatening to encumber real property in Trust C and to use the proceeds for his own benefit. She also alleged that Harry had removed valuable art objects and artifacts from his residence that she claimed

---

[1]        A QTIP marital trust is a mechanism for avoiding federal estate taxes. (*Estate of Ellingson v. C.I.R.* (9th Cir. 1992) 964 F.2d 959, 960.) The inner workings of these trusts are not relevant on appeal.

3

was Trust C property. Later that year, Susan and Harry signed an "interim agreement," which permitted Harry to borrow $3.5 million against the real property in Trust C. It specified that the loan would be an adjustable-rate mortgage, starting at 2.25 percent for the first year, with annual payment increases not to exceed 7.5 percent of the previous year's payments. The agreement specified where the proceeds of the loan were to be spent. Nine hundred thousand dollars would be invested in an interest bearing account (called the "sinking fund"), with the interest to be paid directly to Harry. The principal of that fund would be used to pay the principal and interest on the mortgage. Eighty-five thousand dollars would be used to pay off an existing loan on the property. The remainder would be invested in a bond account, with the interest and income on that account to be paid directly to Harry. The principal of the bond account could not be withdrawn unless for a purpose permitted by Trust C. Susan was entitled to monthly account statements on both the cash account and the bond account, and she was entitled to a 30-day written notice of a withdrawal of the principal of either account. The agreement concluded with the following: "by executing this interim agreement, it is neither Harry's intent . . . nor Susan's intent to waive or release any claims that they have against each other . . . ."

In 2007, Harry sued Susan for violating the "no contest" clause of the trust, seeking to disinherit her.

In December 2010, Harry and Susan signed a "General Release and Settlement Agreement" to resolve all of the litigation between them. The consideration included the following. Harry was to receive $1,040,000 from Trust C, payable, if necessary, from the bond account. Susan was to receive $500,000. The sinking fund would continue to pay "the existing . . . mortgage, or any refinanced or replacement mortgage." Harry would continue to receive all income generated by Trust C investments, including the sinking fund and the bond account. And the parties dismissed

4

their existing litigation with prejudice.  Both parties were represented by counsel in negotiating the agreement.

All of the art from Warren Imports was sold at auction when the business closed in 2006, and the proceeds distributed to the owners, Susan, Michael May, and Harry.

Harry died in March 2012.  In August 2012, Susan filed the present petition.  In May 2013, Zahide's counsel signed a stipulation to permit Susan to file a first amended petition.  Zahide's counsel agreed to sign the stipulation only after receiving Susan's counsel's assurance that he would not add a prayer for an accounting, to which Susan's counsel agreed.

In the petition, although there is a vague reference to the improper withdrawal of principal from Trusts B and C, almost the entire focus is on the allegedly misappropriated pieces of art.  The petition claims Harry misappropriated the art and/or undervalued the art for purposes of establishing the trust values, which devalued her vested rights.  The prayer in the petition seeks only the restitution of "misappropriated tangible personal property" and damages for "the fraudulent undervaluation of tangible personal property on the 706 estate tax return of Maxine Lawrence."

In August 2013, Susan filed a motion to amend her petition to add a prayer for an accounting.  She set the hearing for September 13, 2013, just 10 days before the scheduled trial date.  The motion was based on vague claims that Harry had improperly invaded the principal of Trusts B and C, and it was also based on claims that he had taken out a $3.6 million loan encumbering real property in Trust C.  As Zahide's opposition pointed out, however, the loan was authorized by the previous settlement agreement.  The court denied the motion, stating, "Such a request adds a new cause of action, not simply a prayer for relief . . . .  With trial only 10 days away, granting this motion would be prejudicial to Respondent."  "[S]uch an accounting could cover several years and take

5

significant effort to assemble.  Finally, . . . counsel for [appellant] stated in writing on May 24, 2013 that he would forbear adding a cause of action for an accounting."

The matter proceeded to a bench trial.  During trial testimony, Susan acknowledged that the art objects at issue in the present case are the same objects that were at issue in the 2004 lawsuit.  Also, Susan called as a witness Michael May, who was employed by Warren Imports for approximately 40 years, ultimately holding the title vice president.  He testified that the art owned by Warren Imports was frequently on display in Harry's home.  He also testified that of the list of art objects in Exhibit 5, which purports to appraise several dozen items that were on display in Harry and Maxine's home, 75 percent were owned personally by Harry and Maxine.

After trial concluded, the court entered judgment in favor of Zahide.  With respect to the art, the court found Susan had "no claim to these assets since:  (1) they were the personal property of [Susan's] parents, Harry and Maxine Lawrence, and passed to her father, Harry Lawrence, individually pursuant to the terms of Maxine Lawrence's will and outside of the Lawrence Family Trust; (2) any such claim was released by way of the December 2010 general release and settlement agreement signed by [Susan] and her father, Harry Lawrence and (3) any such claim is barred by the three-year statute of limitations codified in Probate Code §§ 16460 and 10382."  The court also addressed the loan Harry had taken out secured by real property in Trust C.  It held, "the Court finds that there has been no breach of fiduciary duty since:  (1) the money obtained from the loans remained in Trust C; (2) the money obtained from the loans was used to generate income to support Harry Lawrence, a legitimate use of Trust C funds during Harry Lawrence's lifetime; (3) any such claim was released by way of the December 2010 general release and settlement agreement signed by [Susan] and her father, Harry

6

Lawrence and (4) any such claim is barred by the three-year statute of limitations codified in Probate Code §§ 16460 and 10382."[2]  Susan timely appealed.

DISCUSSION

We begin by addressing Maxine's interest in the art collection, which Susan claims passed into the trust as part of the residue of Maxine's estate.  The issue turns on whether the art was bequeathed to Harry outside of the trust pursuant to the following provision in Maxine's will:  "I give all my household furniture, and furnishings, personal automobiles, and other tangible articles of a personal nature, . . . not otherwise specifically disposed of by this will or in any other manner . . . to my husband . . . ."  Susan's counsel made the following concession at trial:  "[F]irst, hypothetical concessions:  . . . if Maxine Lawrence's will had simply said — as many wills do — 'I leave all my tangible personal property to my husband, the remainder of my estate to my trust,' Susan would have no claim to the oriental art collection . . . ."  Susan argues it does not mean that, but contends instead that the phrase refers to physical items to which Maxine had an emotional connection.  There was no extrinsic evidence introduced regarding Maxine's intent.  And the parties have not cited any cases using the phrase "tangible property of a personal nature," nor have we found any.

We conclude there is no difference between the phrases "tangible personal property" and "tangible property of a personal nature."  Grammatically, they mean exactly the same thing.  Moreover, this is a testamentary document.  It would be strange to ask heirs to determine, post-mortem, which items the decedent had an emotional connection to and which ones she did not.  It would be far more common to refer to

---

[2]  The court also rejected Susan's claim that the 2010 settlement agreement is unenforceable on the grounds of duress, finding "inconsistency in her testimony" and "lack of credibility."  Susan does not raise the duress argument on appeal.

7

personal property in the legal sense. And, indeed, the term "tangible personal property" is specifically defined in the Probate Code as "articles of personal or household use or ornament, including, but not limited to, furniture, furnishings, automobiles, boats, and jewelry, as well as precious metals in any tangible form, such as bullion or coins and articles held for investment purposes." (Prob. Code, § 6132, subd. (h)(1).) We think it far more likely Maxine intended to convey this legal concept rather than some vague concept of emotional attachment. Consistent with Susan's concession, therefore, the art work passed directly to Harry as tangible personal property, either as "household . . . ornament" or "articles held for investment purposes," and thus was not part of the residue of the state that went into the trust.[3]

Susan also claims the court erred by failing to find Harry breached his fiduciary duty by refinancing the loan on the real property in Trust C and using $1 million of the proceeds to purchase a house in Dana Point for himself and Zahide. We conclude this issue is waived for two reasons. First, Susan did not include a single citation to evidence in the record to support this allegation. And in our independent review of the record, we found no support for this claim. Second, Zahide testified that the Dana Point property was purchased with the proceeds of the sale of Warren Imports, not the loan proceeds, a fact Susan conspicuously omits mentioning. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 ["if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived'"]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["'The appellate court is not required to search the record on its own seeking error.'

---

[3] Given our resolution of this issue, we need not address whether Susan's claim to the art was barred either by the 2010 settlement agreement or by the statute of limitations.

[Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived'".)

Susan also claims Harry breached his fiduciary duty by, in December 2010, selling off over $1 million of bonds in the bond fund from Trust C. Again, she has waived the issue by failing to present us with all relevant facts. She omits mentioning that the settlement agreement, signed in *December of 2010*, entitled Harry to a payment of $1,040,000 from Trust C. That agreement, moreover, specifically permitted Harry to take that money *from the bond fund*. The omission of this crucial fact is inexcusable and results in a waiver.

Rather than present us with the relevant facts, Susan simply argues that the settlement agreement was unenforceable pursuant to Probate Code section 16464, subdivision (b)(2), which states, "A release or contract is not effective to discharge the trustee's liability for a breach of trust in any of the following circumstances," including, "Where the beneficiary did not know of his or her rights and of the material facts (A) that the trustee knew or reasonably should have known and (B) that the trustee did not reasonably believe that the beneficiary knew." The trial court never made findings on this issue because Susan never presented it to the court. Her theory at trial was that the settlement agreement was unenforceable because it was the product of duress (the court rejected this contention). Although a party may raise new purely legal issues on appeal, we will not consider a new theory that, as this one does, requires factual findings on disputed evidence. (*Cal Sierra Construction*, *Inc. v. Comerica Bank* (2012) 206 Cal.App.4th 841, 850.)

Moreover, with respect to the loans, Susan does not specify what facts were concealed. The interim settlement agreement specified quite clearly the amount and disposition of the loan proceeds. Susan was entitled to receive regular account statements on the sinking fund and the bond account, and the one statement we have in the record indicates she was receiving copies. Thus from our review of the record, at least with

9

respect to the loans, the relevant facts were revealed and the settlement agreement is valid.

Next, Susan claims some of the art should be characterized as a "later discovered asset," and thus part of Trust C. In Maxine's estate tax return, it was stated, "A protective election is made for the decedent's interest in any later discovered assets to be allocated to Trust 'C.'" Susan contends, "The evidence was not disputed that art was shuffled back and forth between the Lawrence residence and the Warren Imports building, and Harry could have thought (albeit mistakenly) at the time he signed Maxine's estate tax return that the art belonged to Warren Imports and was therefore not part of the trust or of Maxine's estate. One could say that the ownership of that art and the characterization of that art as privately-owned investment property was 'discovered' after Maxine's estate tax return was sent to the IRS." But whatever "could" be said or "could" have happened, Susan offers no evidence that it actually happened. We will not reverse a judgment on the basis of speculation.

Lastly, Susan claims the court abused its discretion in denying her motion to amend her petition to add a prayer for an accounting. Although motions to amend are generally granted liberally (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 944-945), eleventh hour requests are not automatic, particularly where there is no excuse for the delay and the opposing party will suffer prejudice. (*Id*. at p. 945; *City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1564.)

We conclude any error was harmless. Susan's request was based on her contention that Harry had encumbered the real property in Trust C, purchased a bond account, and paid himself the income from the bond account while using other Trust C funds to service the loan. But this is precisely what the interim settlement agreement, signed in 2004, permitted. All income from the bond account was to be paid directly to Harry. And the mortgage was to be serviced with the sinking fund. Consequently, even

10

if Susan had been permitted to add a request for an accounting to her prayer, there was no evidence to support any claimed damages.[4]

DISPOSITION

The judgment is affirmed.  Zahide shall recover her costs incurred on appeal.[5]


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

---

[4] Notably, Susan does not claim any evidence at trial was excluded as a result of the denial of her motion to amend.

[5] Susan's motion for judicial notice is denied on the ground that the proffered exhibits, two recorded deeds, were not in evidence before the trial court.  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court"].)

11